**FOR PUBLICATION**

ATTORNEY FOR APPELLANT:

**STEVEN J. BRUCE**
Muncie, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANGELA N. SANCHEZ**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Jun 05 2012, 9:10 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| KEVIN C. O'CONNELL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 18A02-1109-CR-889 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE DELAWARE CIRCUIT COURT
The Honorable John M. Feick, Judge
Cause No. 18C04-0907-FC-20

**June 5, 2012**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Kevin C. O'Connell ("O'Connell") was convicted in Delaware Circuit Court of Class C felony attempted escape, Class B misdemeanor disorderly conduct, and Class B misdemeanor public intoxication. O'Connell appeals and argues that the trial court abused its discretion when it refused O'Connell's tendered jury instructions that inserted the word "voluntary" into the elements of the charged offenses. Concluding that the substance of O'Connell's tendered instructions were covered by other instructions given by the trial court, we affirm.

**Facts and Procedural History**

On July 21, 2009, O'Connell was at a gas station in Delaware County. As he entered the store at the station, O'Connell stumbled into a trash can, nearly knocking it over. When he got in line for the cash register, O'Connell again stumbled and nearly knocked over a shelving unit. When he reached the cashier, O'Connell asked the cashier for a lighter. The cashier gave O'Connell a lighter, and O'Connell started smoking a cigarette in the store. The cashier told O'Connell to go outside to smoke the cigarette, but he had to repeat his request multiple times before O'Connell complied. O'Connell tried to talk to the cashier, but his words were slurred and did "not mak[e] a whole lot of sense." Tr. p. 55. Another customer who left the store before O'Connell telephoned the police and reported O'Connell's behavior.

Once outside, O'Connell sat in the driver's seat of his car for a while, exclaiming loudly that he was Jesus Christ. He then got back out of his car, stumbled to the entrance of the store, and sat down. As he sat, O'Connell prayed loudly, and again proclaimed that he was the messiah. Albany Police Department Officer Shannon Fritz ("Officer

2

Fritz") arrived at the scene and observed O'Connell alternating between praying loudly and cursing. Officer Fritz asked O'Connell if there was a problem but "could [not] get much out of him" because his speech was very slurred and erratic. Id. at 60. Officer Fritz also smelled the odor of an alcoholic beverage and noticed that O'Connell had bloodshot eyes and poor balance. Based on these observations, Officer Fritz determined that O'Connell was intoxicated.

Shortly thereafter, Deputy Randy Ogle ("Deputy Ogle") arrived at the scene and heard O'Connell call Officer Fritz a "boy" and a "piece of sh*t." Id. at 82. Deputy Ogle also came to the conclusion that O'Connell was intoxicated based on O'Connell's slurred speech, glassy red eyes, poor balance, and the "strong odor of alcohol." Id. at 83. Deputy Ogle arrested O'Connell and transported him to the Delaware County Jail. On the way to the jail, O'Connell initially calmed down. As they approached the jail, however, he began to curse Deputy Ogle, calling him too a "piece of sh*t." Id. at 89.

When Deputy Ogle began booking O'Connell at the jail, O'Connell collapsed onto the ground and began to "growl," make funny noises, and pray. Id. at 90. At one point, O'Connell became "totally still" and would not talk to the jailers. Id. Because O'Connell was unresponsive, the jail called medical personnel to transport him to the hospital. When the medical personnel strapped O'Connell to the gurney, he woke up and began to yell and scream again. He alternated between asking for help and cursing, but had returned to uttering "gibberish" and mumbling by the time he reached the hospital. Id. at 106.

3

At the hospital, a doctor and a nurse examined O'Connell. Deputy Ogle sat by his bed and at one point, as O'Connell was exhibiting erratic behaviors, Deputy Ogle told him, "I don't care what you do or say[,] you're not going [to] get out of going to jail." Id. at 93. O'Connell continued to babble for a while, but then stopped, looked at Deputy Ogle, and stated in a "plain, clear voice," "I'm a member of the Irish Republican Army. I'm going to burn your house down, or I'm going to burn you down. Me and my people are going to come and burn you down[.]" Id.

When the hospital released O'Connell, Deputy Ogle prepared to return him to the jail by placing him in handcuffs and leg shackles and sitting him in the passenger seat of his patrol car. When Deputy Ogle approached the jail in his patrol car, O'Connell was alert but quiet. When they arrived at the jail, Deputy Ogle exited his vehicle and began placing his weapon into the lockbox on the wall of the garage. As he did so, he heard a "click," and turned to see that O'Connell had opened the passenger door of the car and was quickly running towards the garage door, which had started to close behind the car after its entrance. Despite being in handcuffs and shackles, O'Connell moved quite quickly. Deputy Ogle ran after O'Connell and administered a "palm strike" to his upper chest, which knocked O'Connell over and prevented him from escaping. Id. at 98.

On July 28, 2009, the State charged O'Connell with Class C felony attempted escape, Class B misdemeanor disorderly conduct, and Class B misdemeanor public intoxication. On July 29, 2011, a jury trial was held. At trial, O'Connell's wife, Bonnie O'Connell ("Bonnie"), testified that O'Connell had suffered a "really bad seizure" the morning of his arrest. Id. at 136. According to Bonnie, she had woken up that morning

4

and found O'Connell thrashing around and, in an attempt to speak, making a noise that was like a whine or a growl. Bonnie then called an ambulance, which transported O'Connell to the hospital. O'Connell and Bonnie stayed at the hospital for several hours before O'Connell was released. After his release, they returned home and Bonnie left for work. When she left, O'Connell was on the couch and was very pale and quiet.

O'Connell testified on his own behalf and also claimed to have suffered from a seizure earlier on the day of his arrest. O'Connell claimed that he had no memory of that day's events after his morning seizure. He also claimed not to have consumed any alcohol that day. In fact, he stated that drinking alcohol in conjunction with his medications could be fatal. He further claimed that he had not had an alcoholic beverage for twenty years.

Based on Bonnie's testimony and his own testimony indicating that he had suffered from a seizure on the morning of his arrest, O'Connell tendered proposed jury instructions concerning the voluntariness of his conduct. His first proposed instruction contained a definition of "voluntary" taken from case law, and the second contained the statutory language regarding the requirement of voluntary conduct. The other three proposed instructions contained the statutory elements of each offense but modified the elements to insert an additional element of voluntariness. The trial court gave the jury an instruction that set forth the statutory language regarding the requirement of voluntary conduct but refused to issue O'Connell's other tendered instructions.

At the conclusion of the trial, the jury found O'Connell guilty as charged. On September 7, 2011, the trial court sentenced O'Connell to two years on the attempted

escape conviction, with all but the ninety days O'Connell had already served suspended to probation. The trial court also sentenced O'Connell to concurrent terms of six months on both misdemeanor convictions, with each sentence to suspended to probation. O'Connell now appeals.

**Discussion and Decision**

O'Connell's sole claim on appeal is that the trial court abused its discretion by refusing to give to the jury his tendered instructions. Our standard of review upon claims of instructional error is well settled:

> The purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. In reviewing a trial court's decision to give a tendered jury instruction, we consider (1) whether the instruction correctly states the law, (2) is supported by the evidence in the record, and (3) is not covered in substance by other instructions. The trial court has discretion in instructing the jury, and we will reverse only when the instructions amount to an abuse of discretion. To constitute an abuse of discretion, the instructions given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury. We will consider jury instructions as a whole and in reference to each other, not in isolation.

Munford v. State, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010).

O'Connell tendered instructions regarding voluntariness. Indiana Code section 35-41-2-1(a) provides in pertinent part that "[a] person commits an offense only if he voluntarily engages in conduct in violation of the statute defining the offense." This section was discussed by our supreme court in McClain v. State, 678 N.E.2d 104, 107 (Ind. 1997), wherein the court wrote:

> Before 1976, Indiana's criminal code lacked basic provisions governing culpability. The voluntary act statute was adopted that year in a new

6

section titled "Basis of Liability," which also included *mens rea* definitions of "intentionally," "knowingly" and "recklessly"—terms now in familiar use in criminal cases. The voluntary act statute codified the axiom that voluntariness is a general element of criminal behavior and reflected the premise that criminal responsibility postulates a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong. . . . The term voluntary is used in this Code as meaning behavior that is produced by an act of choice and is capable of being controlled by a human being who is in a conscious state of mind.

(citations and internal quotations omitted).

Once evidence in the record raises the issue of voluntariness, the State must prove beyond a reasonable doubt that the defendant acted voluntarily. Id. (citing Baird v. State, 604 N.E.2d 1170, 1176 (Ind. 1992)). If the State fails to prove that a defendant's conduct was voluntary, it has not proved every element of the offense. See id. But see Davidson v. State, 849 N.E.2d 591, 593 (Ind. 2006) (concluding that defendant was not entitled to voluntariness instruction because his conduct was covered under statutes governing defense of intoxication, not voluntariness, but suggesting that voluntariness is not an element). In Davidson, our supreme court noted:

The drafters of Indiana's voluntariness provision used section 2.01 of the Model Penal Code as the source. The American Law Institute report on the provision indicates that its purpose is to exclude from voluntary conduct those mental impairments that are the product of an otherwise healthy mind. The illustrative examples are reflexes, convulsions, unconsciousness (for example, a driver who loses consciousness and runs over a pedestrian), somnambulism, hypnosis, and a residual category for movements not a product of the actor's effort (where the actor is moved by force). Because the Model Penal Code's list of such conditions was not imported into our Code, we have recognized that certain conditions not included in the ALI model can be covered under the Indiana statute.

849 N.E.2d at 594 (citations omitted); see also Marley v. State, 747 N.E.2d 1123, 1128 (Ind. 2001) ("McClain staked out a small area of mental states, e.g., sleepwalking,

epilepsy, and metabolic disorders, that are not attributable to any mental disease or defect but nevertheless negate the voluntariness requirement). With this understanding of the voluntariness statute, we turn to the question of whether the trial court should have given O'Connell's tendered instructions.

The first portion of our analysis is whether the tendered instructions were a correct statement of the law. Munford, 923 N.E.2d at 14. As explained above, O'Connell's tendered instructions set forth the statutory elements of each of the offenses he was charged with: escape, disorderly conduct, and public intoxication. But in addition to the statutory *mens rea* requirements, O'Connell's tendered instructions inserted the word "voluntarily." Appellant's App. p. 70. O'Connell also tendered an instruction that read, "A person commits an offense only if he voluntarily engages in conduct in violation of the statute defining the offense."[1] Id. at 67 (citing I.C. § 35-41-2-1). The trial court gave the jury only this last instruction tracking the language of Indiana Code section 35-41-2-1 and rejected O'Connell's other tendered instructions.

O'Connell notes that the instructions he tendered were taken from the pattern jury instructions, a claim the State does not deny. See also Davidson, 849 N.E.2d at 593 (noting that Indiana Pattern Jury Instructions insert the phrase "and voluntarily" into the elements of a crime when the evidence raises a voluntariness issue). And this pattern jury

---

[1] O'Connell also tendered an instruction that read, "[t]he term voluntary is defined as meaning behavior that is produced by an act of choice and is capable of being controlled by a human being who is in a conscious state of mind." Id. at 66 (citing McClain, 678 N.E.2d at 107). O'Connell makes no cognizable argument regarding the trial court's rejection of this instruction and instead focuses his argument on the tendered instructions which inserted the word "voluntarily" into the elements of the charged offenses.

8

instruction finds support in the case law. See id. (noting that the pattern jury instruction is based on the holding in Baird, 604 N.E.2d at 1176). We therefore disagree with the State that O'Connell's tendered instructions were an incorrect statement of the law.

But simply because the instructions were a correct statement of the law does not mean that the trial court committed reversible error by refusing to give the tendered instructions. Even if an instruction is a correct statement of the law and finds some support in the evidence,[2] a trial court may still in its discretion refuse a tendered instruction if it is covered in substance by other instructions. Munford, 923 N.E.2d at 14.

Here, even though the trial court refused O'Connell's tendered instructions inserting the word "voluntary" into the elements of the crime, it did instruct the jury that "[a] person commits an offense only if he voluntarily engages in conduct in violation of the statute defining the offense." Appellant's App. p. 67 (citing I.C. § 35-41-2-1). The trial court also instructed the jury on the statutory elements of each charged offense and the definitions of the *mens rea* requirement of each of these offenses. And the jury was repeatedly instructed that the State bore the burden of proving that O'Connell was guilty beyond a reasonable doubt. We therefore conclude that, considered as a whole, the trial court's instructions adequately informed the jury that, in order to find O'Connell guilty,

---

[2] Even if we were to agree that there was some evidence that, if credited, might indicate that O'Connell's initial behavior at the store was involuntary, there is no evidence indicating that his act of running away from Deputy Ogle's police car and attempting to flee out the garage was involuntary. In fact, the description of O'Connell's behavior during his earlier alleged seizure was entirely inconsistent with his act of fleeing from Deputy Ogle. Thus, with regard to the escape conviction—the most serious of O'Connell's convictions—there was no evidentiary support for the tendered voluntariness instruction.

9

the State had to prove beyond a reasonable doubt that he voluntarily engaged in the conduct alleged by the State.

We find support for our conclusion in Sanders v. State, 466 N.E.2d 424 (Ind. 1984). In that case, Sanders was convicted of armed robbery. At trial, Sanders testified that another individual had ordered him to commit the robbery and stayed out of sight while pointing a gun at the defendant in order to force him to commit the robbery. Id. at 427. On appeal, Sanders claimed that the trial court erred in refusing his tendered instruction relating to his defense of voluntariness, which recited the voluntariness statute. Id. Our supreme court held that Sanders was not entitled to the instruction because he was not entitled to an involuntariness defense.[3] Id. Still, the court went on to address the "general application" of Sanders's tendered voluntariness instruction and concluded that its substance was covered by other instructions that the trial court did give. Id. Specifically, the court noted that the jury had been instructed that the robbery statute required that the taking of another's property must be done "knowingly or intentionally." Id. (quoting Ind. Code § 35-42-5-1). The trial court also gave instructions defining the State's burden of proof and explaining that the State had to establish all elements of the charged crime. Thus, the Sanders court concluded that these instructions "covered the substance" of the tendered voluntariness instruction. Id. at 428-29.

In the present case, the trial court instructed the jury with regard to the elements of the crimes, including the respective *mens rea* requirements, the State's burden of proof,

---

[3] The court had already concluded that Sanders was not entitled to an involuntariness defense and that the proper defense was instead that of duress. Id. at 428.

10

and that all the elements must be proved. According to Sanders, this alone would be sufficient. But here, the trial court went even further and instructed the jury that "[a] person commits an offense only if he voluntarily engages in conduct in violation of the statute defining the offense." Appellant's App. p. 67. This instruction, in conjunction with the instructions explaining the statutory elements of the charged offenses and the State's burden of proof, adequately informed the jury that, in order to find O'Connell guilty, the State had to prove beyond a reasonable doubt that he voluntarily engaged in the conduct alleged by the State.

The dissent criticizes our citation to Sanders, and concludes that the law on voluntariness has evolved since Sanders so as to require that the trial court "*directly* instruct the jury that once the evidence raises the issue of voluntary conduct, the State must prove that the defendant's actions were voluntary beyond a reasonable doubt." Slip op., infra, at 16 (emphasis added). This would mean that, when voluntariness is raised, a trial court must give the jury any instruction that directly inserts the word "voluntarily" into the elements of the crime. The effect of this would be that only the pattern jury instruction, or one substantially similar to it, could properly be given whenever the issue of voluntariness was raised by the evidence. While we agree that the better practice would be to use the pattern jury instruction, our standard of review does not require it. To say that the trial court's rejection of O'Connell's tendered instructions constitutes an abuse of discretion fails to consider the adequacy of the jury instructions *as a whole and in reference to each other*, not in isolation. See Munford, 923 N.E.2d at 14.

11

In the case before us, it is not dispositive that no instruction *directly* explained to the jury that the State was required to prove beyond a reasonable doubt that O'Connell's criminal conduct was voluntary. The trial court's instructions informed the jury (1) that the State was required to prove that O'Connell was guilty beyond a reasonable doubt and (2) also instructed that he could be convicted only if he voluntarily engaged in the conduct in violation of the statute defining the offenses. These instructions, considered as a whole, in reference to each other and not in isolation, adequately explained to the jury the State's burden of proving that O'Connell's actions were voluntary. Simply put, the instructions as a whole did not misstate the law or otherwise mislead the jury. See Hurt v. State, 570 N.E.2d 16, 18 (Ind. 1991) (holding that there was no error where one instruction did not inform the jury that, in order to convict defendant of attempted murder, the evidence must show that defendant had a specific intent to commit murder but where subsequent instruction did inform jury of this requirement and concluding that the instructions, when read as a whole, adequately informed the jury of the requirement of specific intent to kill).

Under these facts and circumstances, the trial court did not abuse its discretion in refusing to give O'Connell's tendered instructions.

Affirmed.

FRIEDLANDER, J., concurs.

RILEY, J., dissents with opinion.

12

KEVIN C. O'CONNELL,               )
                                  )
    Appellant-Defendant,          )
                                  )
        vs.                       )      No. 18A02-1109-CR-889
                                  )
STATE OF INDIANA,                 )
                                  )
    Appellee-Plaintiff.           )

**RILEY, Judge, dissenting**

I respectfully disagree with the majority's conclusion that the trial court's tendered jury instructions as a whole covered the substance of O'Connell's proposed instructions. The majority concludes that it was sufficient that the trial court instructed the jury that "[a] person commits an offense only if he voluntarily engages in conduct in violation of the statute defining the offense" and also instructed the jury regarding the *mens rea* requirement for each of O'Connell's charged offenses. (Appellant's App. p. 67). In support of this conclusion, the majority cites *Sanders,* a 1984 case in which our supreme court stated that Sanders' proposed jury instruction on voluntary conduct was covered by the tendered instructions as a whole. *Sanders v. State,* 466 N.E.2d 424, 428 (Ind. 1984). The supreme court reasoned that it was sufficient that the trial court's final instructions included the robbery statute, which provided that the taking of another's property had to be done "knowingly or intentionally," and that the trial court also gave the jury

13

instructions regarding the State's burden of proof and the fact that the State had to prove all elements of the described crime. *Id.*

However, as *dicta,* this analysis was not binding on either the supreme court or our court, and I find that the supreme court's analysis has expanded since *Sanders.* In *Baird v. State,* 604 N.E.2d 1170, 1176 (Ind. 1992), *cert. denied,* 510 U.S. 893 (1993), the supreme court held that "once evidence in the record raises the issue of voluntariness, the [S]tate must prove the defendant acted voluntarily beyond a reasonable doubt." The significance of this holding is apparent in the Indiana Judge's Association's decision to amend the Indiana Pattern Jury Instructions as a result of *Baird* to emphasize that, once the issue is raised, the State must prove voluntariness beyond a reasonable doubt. *See Davidson v. State,* 849 N.E.2d 591 (Ind. 2006). While the supreme court has never officially approved the Indiana Pattern Jury Instructions, we have previously noted that the preferred practice is to use the pattern jury instructions and that the instructions have the "apparent approval of the Indiana Supreme Court as evidenced by the preferred treatment given such instructions in [Indiana Rule of Trial Procedure 51(E)]." *Gravens v. State,* 836 N.E.2d 490, 493 (Ind. Ct. App. 2005), *trans. denied.*

*Baird*'s effect on the pattern jury instructions is especially relevant to the instant case. A pre-*Baird* version of Pattern Jury Instruction § 9.01 regarding voluntary conduct stated that:

Voluntary conduct is defined by statute as follows:

A person commits an offense only if he voluntarily engages in violation of the statute defining the offense. However, a person who omits to perform

14

an act commits an offense only if he has a statutory, common law or contractual duty to perform the act.

INDIANA PATTERN JURY INSTRUCTIONS § 9.01 (1980). Significantly, this instruction is similar to the one tendered by the trial court here because it merely reiterates the statutory provision that a person only commits an offense if his actions are voluntary. *See* I.C. § 35-41-2-1(a). It does not mention the State's "beyond a reasonable doubt" burden of proof. In contrast, as a result of *Baird*, Pattern Jury Instruction § 9.01 currently provides that:

> [When evidence raises an issue of voluntariness, modify the instruction defining the offense by adding the italicized material shown in the example below:]
> The crime of theft is defined by statute as follows:
> A person who knowingly or intentionally [*and voluntarily*] exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class D felony.
> Before you may convict the Defendant, the State must have proved each of the following elements beyond a reasonable doubt:
> 1. The Defendant
> 2. knowingly or intentionally
> 3. [*and voluntarily*]
> 4. exerted unauthorized control over property of [*name*], another person
> 5. with intent to deprive [*name the other person*] of any part of the property's value or use.
> If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of theft, a Class D felony, charged in Count_____.

INDIANA PATTERN JURY INSTRUCTIONS § 9.01 (3rd ed. 11/2004). This version of § 9.01 explicitly emphasizes that the State must prove "voluntariness" beyond a reasonable doubt.

In 2006, the supreme court implicitly approved the current version of Instruction § 9.01 in *Davidson*. There, Davidson tendered a proposed jury instruction including "and voluntarily" as an element of his offense. *Davidson,* 849 N.E.2d at 593. Davidson argued that the inclusion of "and voluntarily" in the elements ensured that the jury knew that the State was required to prove that he acted voluntarily beyond a reasonable doubt. *Id.* In response, the supreme court concluded that "[t]he real problem with this contention is that the condition that underlay Davidson's defense is covered by our Indiana Code section on intoxication and not by the section on voluntariness." *Id.* at 594. Thus, the supreme court did not dispute that it was proper to add voluntariness as an element in a jury instruction; it merely decided the case on other grounds. *See id.*

In light of the foregoing, I conclude that the supreme court's analysis has evolved since *Sanders* with the effect that an adequate jury instruction must now directly instruct the jury that once the evidence raises the issue of voluntary conduct, the State must prove that the defendant's actions were voluntary beyond a reasonable doubt. The trial court's Jury Instruction No. 6 does not do so. Instead, its language mirrors the substance of the language of the pre-*Baird* version of Pattern Jury Instruction § 9.01. As the amendment to § 9.01 and the supreme court in *Davidson* implied, this language is no longer adequate; nor did any of the trial court's other tendered jury instructions instruct the jury that the State had the burden of proving that O'Connell's actions were voluntary beyond a reasonable doubt. Thus, I conclude that the trial court's tendered jury instructions as a whole did not sufficiently cover the substance of O'Connell's proposed jury instructions.

As the majority found that O'Connell's proposed instructions were covered in substance by the tendered instructions, the majority did not address the remaining two factors that we must consider when determining whether the trial court has abused its discretion in instructing the jury: (1) whether the proposed instructions correctly stated the law and (2) were supported by the evidence in the record. *Alfrey v. State,* 960 N.E.2d 229, 232 (Ind. Ct. App. 2012). Because I do not find that O'Connell's proposed instructions were covered in substance by the trial court's tendered instructions, I will address these remaining two factors.

With respect to the first factor, the State asserts that O'Connell misstated the law by inserting voluntariness as an element of his charged offenses. As I stated previously, Indiana Pattern Jury Instruction § 9.01 clearly included voluntariness as an element of theft, even though voluntariness is not a statutory element of theft. *See* I.C. § 35-43-4-2. While this instruction used theft as an example, rather than disorderly conduct or escape, I conclude that its placement in the "voluntary conduct" chapter indicates that it is meant to be a guide for instructions on voluntary conduct with respect to all relevant offenses, not just theft. *See* INDIANA PATTERN JURY INSTRUCTIONS § 9.01 (3rd ed. 11/2004). In addition, as stated above, the supreme court indirectly implied in *Davidson* that it is proper to add voluntariness as an element in a jury instruction. *Davidson,* 849 N.E.2d at 593-94.

Further, I find that the evidence in the record raised the issue of whether O'Connell's conduct was voluntary. Bonnie testified that during his seizure, O'Connell "was thrashing around on the floor and trying to talk and could [not] talk," but was

17

making noises like a whining or a growl. (Tr. p. 136). Officer Fritz and Deputy Ogle later used the term "growl" to describe O'Connell's noises and also indicated that at points O'Connell made erratic movements and could not talk. (Tr. p. 90). Bonnie also testified that during seizures O'Connell tended to get "agitated and hateful" and had poor balance, which mirrors the behaviors that Officer Fritz and Deputy Ogle later described. When O'Connell testified, he told the court that he could not remember anything after his release from Ball Memorial Hospital in the morning. This evidence raises the issue of whether his actions were involuntary due to seizures.

In sum, I conclude that the trial court abused its discretion in denying O'Connell's proposed instructions.